Harper, J.
This is a case, both of novelty and importance, and I have considered it carefully, with reference to the authorities within my reach. On the part of the plaintiffs, it is contended that, under our law, slaves being considered personal chattels, “ to all intents, constructions, and purposes, whatsoever,” they are absolutely incapable of taking a legacy, and that the bequest to them is absolutely void ; or that if a trust is created in their favor, it is incapable of being executed, and the estate must be distributed among the next of kin. On the part of the defendants, it is urged — First, that under the civil law, slaves have capacity to take for the benefit of the master, and that this should have much authority with us, as. the state of slavery which existed under that law, was anal°g0l;is to that which exists among us; Secondly,* that if we J adopt the rule of the common law in relation to villeins, the same conseqnence will follow; they had capacity to take, though liable to be *299 divested of the property by the lord: or, Thirdly, that if they are considered incapable of taking, this must be considered a beneficial bequest to the executor, for his own use, the testator having intended him to take the property absolutely and dispose of it at his pleasure, relying only on his friendship and good faith to dispose of it according to his wishes.
With respect to the civil law, however enlightened and admirable a system of jurisprudence it may be, it is not our law, nor have our Courts any authority to declare it so. Our Legislature has adopted another system of laws. Where our law is obscure or doubtful, it is frequently of great utility in explaining or determining it, more especially as a great portion of our law was derived from that source. But if the common law be clear, we are not authorized to depart from it because the provisions of another system may be better and more suited to our circumstances ; nor if it be defective, are Courts authorized to supply the deficiency by drawing from a foreign source. Nor do I think the common law, in relation to villenage, can govern in relation to this matter. The status, the entire civil and political condition of the villein, was, in almost every particular, different from that of our slave. He had a perfect, civil and political capacity, and all the rights of a freeman, against every person but his lord; and, with respect to the lord, the relation was very different from that of the slave to his master__Co. Lit. 123 b ; and see the note G. to Thomas’ edition, 1 vol. 421.
Though Coke seems to refer the origin of all servitude to captivity in war, yet we know that it often originated in voluntary contract; and I apprehend that the essential distinction between villenage and slavery, is, that the former was supposed, at least in theory of law, to have thus originated. I have no doubt but that, very anciently among the Saxons, perfect slavery existed, such as now exists among us, but this appears to have been much modified by the feudal system. — Blackstone seems to favor this supposition — 2 Com. 92. “ Under the Saxon government, there were, as Sir. William Temple speaks, a sort of people in a condition of downright servitude, used and employed in the most servile works, and belonging, both they, and their children and effects, to the lord of the soil, like the rest of the cattle or stock upon it. *Theseseem r„,qcn to have been those who held what was called the folk-land, from L which they were removable at the lord’s pleasure. On the arrival of the Normans here, it seems not improbable that they, who were strangers to any other than a feudal state, might give some sparks of enfranchisement to such wretched persons as fell to their share, by admitting them to the oath of fealty, which conferred a right of protection, and raised the tenant to a kind of estate, superior to downright slavery, but inferior to every other condition.” Beeves, in his History of the Common Law, states that the tenure of villenage was established by the Normans — 2 vol. p. 39, c. 2. Mr. Hallam, in his view of the state of Europe during the middle ages, in allusion to the ancient state of slavery, says, that “in England it was very common, even till after the conquest, to export slaves to Ireland, till in the reign of Henry II. the Irish came to a non-importation agreement, which put a stop to the practice.” He has also a curious note on the same subject.
If villenage was supposed to be a species of tenure, originating, as all other tenures did, in voluntary agreement, the villein consenting to serve *300 in consideration of support and protection, will explain why he was regarded as a freeman with respect to every other person than his lord, and even with respect to him had reserved some privileges. "Very different was the condition of the captive taken in war. Lord Coke says, Co. Lit. 1, 16 b., “ Fiunt etiam servi liberi homines captiviiate de jure gentium, and.not by the law of nature, as from the time of Noah’s.flood forward, in which time all things were common to all, and free to all men alike, and lived under the law natural, and by multiplication of people, and making proper and private those things that were common, arose battles. And then it was ordained by the constitution of nations, that none should kill another; but that he that was taken in battle, should remain bond to his taker forever, and to do with him and all that should come of him, his will and pleasure, as with his beast or any other chati el, to give, or to sell, or to kill, &c., &c.” We know that in point of fact, African slaves were generally captives taken in war. After the practice of enslaving prisoners of war was abandoned in Europe, the captor was supposed to have a property in his prisoner, for the purpose of enforcing a ransom. At a later period, prisoners of war were at the disposal of the State.
I think that the true state of the slave must be ascertained by *re^erence-'to the disabilities of an alien enemy, in which light the -* heathen were anciently regarded; though certainly modern humanity, the progress of opinion, and positive legislation, have greatly modified their condition. In Calvin’s case, I Co. p. 33, after speaking of the condition of alien friends, it is said, “but if this alien become an enemy, (as all alien friends may,) then he is utterly disabled to maintain any action, or get anything within this realm. And this is to be understood of a temporary alien, that being an enemy may be a friend, or being a friend may be an enemy. But a perpetual enemy (though there be no wars by fire and sword between them) cannot maintain any action, or get anything within this realm. All infidels are in law, perpe^ui inimici,' perpetual enemies, for the law presumes not that they will be converted, that being remota potentia, (a remote possibility,) for between them, as with the devils, whose subjects they be, and the Christian, there can be no peace, for as the Apostle saith, 2 Cor. vi. 15, Quce autem conventio Ghristi,ad Belial, aut quce pars fideli cum infideli, and the law saith, JudcBO Ghristianum nullum serviat mancipium, nefas enim est quern Christus redemit blasphemum Ghristi in servitutis vinculis detinere. Register, 282. Infideles sunt Ghristi et Ghristianorum inimici. And herewith agreeth the book in 12 H. 8, fob 4, where it is holden, the Pagen cannot have or maintain any action at all. [Quaere.]
“And upon this ground, there is a diversity between a conquest of the' kingdom of a Christian king, and the conquest of the kingdom of an infidel; for if a king come to a Christian kingdom by conquest, seeing that he hath vitae et necis poteslatem, he may at his pleasure alter and change the laws of that kingdom, but until he doth make an alteration of those laws, the ancient laws of that kingdom remain. But if a Christian -king should conquer a kingdom of an infidel, and bring them under his subjugation, there ipso facto the laws of the infidel are abrogated, for that they be not only against Christianity, but against the law of Gfod and nature contained in the Decalogue, and in that case, until certain laws be *301 established among them, the king by himself, and such judges as he shall appoint, shall judge them and their causes according to natural equity, in such sort as kings in ancient times did with their kingdoms before any certain municipal laws were given, as before hath been said, that is.to say, they have no law but the king’s pleasure.
*1 am perfectly aware that this law has been denied, and in Omychund n. Barker, 1 Atk. 42, in the opinion of the Lord Chief [*393 Baron, it is said that the enmity of heathens is to be understood of spiritual discord only. He refers to Salk. 46, where is quoted from Sir Edward Littleton’s readings on the statute 2I Ed. 3, “Turks and infidels are not perpetui inimici, nor is there a particular enmity between them and us; but this is a common error founded on the groundless opinion of Justice Brooke; for though there be a difference between our religion and theirs, that does not oblige us to be enemies of their persons : they are the creatures of God, and of the same kind that we are, and it would be a sin in us to hurt their persons.”
It is not necessary to vindicate the humanity of Lord Coke’s doctrine, nor its conformity to the spirit of Christianity; but that such was the law, not only of England, but of all Europe, is supported by the most notorious facts, and the practice not only of the English government, but of all the nations of Christendom. Upon this natural enmity of the heathen was founded the claim of the Pope, as God’s vicegerent upon earth, to parcel out the countries inhabited by heathens among the governments of Europe. This was derived no doubt from the commands given to the Jews in the Old Testament, to drive out, extirpate, and enslave, if they could not convert, the heathen nations inhabiting the countries which they (the Jews) were to inhabit, and which commands were supposed to be of general obligation, and to apply to Christians. On this principle, the Spaniards took possession of the countries in America, and enslaved their inhabitants. In Irving’s Life of Columbus, vol. 2, book viii. chap. 5, after speaking of the first Indians sent as slaves by Columbus to Spain, the author adds, “the customs of the times, however, must be pleaded in his apology. The precedent had been given long before, by both Spaniards and Portuguese, in their African discoveries, where the traffic in slaves formed one of the greatest sources of profit. In fact the practice had been sanctioned by the highest authority, by that of the Church itself, and the most learned theologians had pronounced all barbarous and infidel nations, who shut their ears to the truths of Christianity, as fair objects of war and rapine, of captivity and slavery.” Bryan Edwards,'in his History of the *West Indies, quotes the bull of the Pope, by which the traffic in African slaves was first sanctioned. I refer also to L dy4 Hallam, to show that the ti’affic in slaves was common over the whole of Europe. The practice of the English government was of the same sort. They took possession as owners of all the countries discovered by them, inhabited by heathens; and we know that in all the colonies of North America, many of the natives were enslaved. On this enmity of the heathen and their destitution of all civil rights, rested the king’s right to grant the lands inhabited by them. Though some of the proprietors did make treaties with the nations, and give them a compensation to induce them to relinquish the possession of their lands, yet this was merely a matter of policy or humanity; the title of the proprietors was considered *302 perfect without this. Spain, and I believe France, to- the latest period of their having- colonies in America, granted to individuals any portion of the land occupied by the natives, which it was thought expedient to grant, without any treaty with or compensation to them. But it is unnecessary to multiply facts which are perfectly known to any one having the slightest acquaintance with history. At the very moment which the judgment in Omychund v. Barker was pronounced, and that in Ramkissenseatu. Barker, 1 Atk. 51, where the plea of alien infidel was summarily overruled by Lord Hardwicke, the English government was notoriously acting on the principles of the doctrine laid down by Lord Coke, through the whole of its American colonies. The lawfulness of the African slave trade, which was then and long afterwards protected and encouraged by the government, was a consequence of the same doctrine. I apprehend that the decisions in the cases to which I have referred, and likewise that in Somerset’s case, notwithstanding the ingenious argument of Mr. Hargrave, were founded rather upqn a consideration of what was due to modern civilization and humanity, than upon the ancient law of England. Sir Thomas Grantham’s case, 3 Mod. 120, sustains these views, where an Indian had been exhibited as a show for profit. Upon his being baptized, a homine replegiando was brought; and in Wells v. Williams, 1 Lord Raym. 282, it seems to be admitted that the law in relation to infidels had been changed.
The Court said, “that the necessity of trade has mollified the too rigorous rules of the old law in their restraint and *discourage-J ment of aliens. A Jew may sue at this day, but heretofore he could not, for then they were looked upon as enemies. But now commerce has taught the world more humanity : and therefore an alien enemy commorant here by license of the king, and under his protection, may maintain debt upon a bond, though he did not come with safe-conduct.” I by no means contend that our law now is generally as laid down by Coke; it has been altered by opinion, by the decisions of the Courts, and by legislation. I suppose that an alien enemy now’ permitted to reside in the country, would be considered under a safe-conduct and protected in person and property. I suppose that it would be unlawful to enslave, and might be murder to kill one of our native Indians; but in considering the status of our slaves, it is necessary to refer to the origin of our relation to them. It is plain that all our practice and legislation respecting them has had reference to their ancient status. ■
First, the Act of 1711 supposes the disabilities of slaves to be founded on their infidelity, and it was thought necessary to provide that by being baptized they should not be thereby emancipated, but continue slaves as before. The Act of 1740 declares that they shall be reputed and adjudged in law’, to be chattels personal in the hands of their owners and possessors, and their executors, “ administrators and assigns, to all intents, purposes, and constructions whatsoever.”
On the notion of their being public enemies, who could have no redress for any personal injury, it provides a penalty for any person who shall beat, bruise, wound or maim a slave, and likewise for the payment of damages to his master.
It provides for punishing the murder of a slave, in terms which very *303 clearly indicate that without such provision it would be subject to no punishment.
On the same notion of their being public enemies, not responsible to the civil laws, it provides generally, that a slave committing an act which would be felony in a free white person, shall suffer the same punishment.
It does not disable slaves from giving testimony against a white person, but taking their incompetency for granted, it positively enables them to give testimony against other slaves. These views may perhaps help to explain some of the difficulties and anomalies *which have been r^onp supposed to exist in the condition of this class of persons. They *- may furnish an answer to the difficulty suggested in argument, that a slave, for many purposes, may be the agent of his master, which could not be if he were regarded as a chattel to all intents and purposes. He is an intelligent human being, through whom the master’s mind may be conveyed. — Through him the master may propose or accept a contract, being capable of acting as his master’s agent. This explains the condition of our Indians in many respects. Laws are made for their protection out of humanity; they are treated with, and compensation is made to them for such lands as they may surrender to the use of the whites ; but in theory of law they are regarded as having no title to their lands, and only occupying them at sufferance. It explains, too, why, though born and living under our territory, they may make war upon the Hnitedo States without being guilty of treason. Being regarded as public enemies, they owe no allegiance, and are therefore incapable of treason.
The difficulty suggested in ease a slave finds a jewel or any other article of value, that it might be seized by any person who should find it in his possession as if it should be found hanging in the fleece of a sheep, does not, I think, exist. He is an intelligent being, capable of taking and intending possession. The law, however, declares him a chattel personal, which is supposed to attend the person of the owner. His possession is, therefore, referred to the master, and on that possession the master might maintain trover against a stranger who should take an article so found from his slave. So, if land were conveyed to a slave, the master, by parity of reasoning, would be seized of that land — (an alien enemy is not disabled to take land by purchase) — being declared by statute a chattel personal in his master’s possession, his seizure or possession must be referred to the master.
It would seem to follow, however, from these principles, that in case of land conveyed to a slave, the master would not take for himself, but only until office found for the State. I know not how to arrive at any other result. An alien cannot hold land ; nor could he grant, convey or lease the land. — Co. Lit. 42 b. Com. Dig. Tit. Alien C. 4. So it is of alien enemy’s choses in action. “No alien enemy shall maintain any action, real, personal or mixed.” Co. Lit. 129, a Com.,Dig. Tit. Alien. C. 5 “ So if an alien enemy *take a bond, the king shall have it.” — Com. Dig. Tit, Alien, C. 2. “ Ghoses in action belonging L to alien enemy are forfeited to the crown, but there must be an inquisition to intitle; and a peace before the inquisition, discharges the causes of forfeiture.” In the case of inimicus perpetuus, however, there can be no peace. An alien enemy is not disabled to take lands, though he holds only until office found. He is not disabled to take *304 personal property in possession, but there is no provision by law for an inquisition by which this shall be vested in the State. By the old law, an alien enemy had no civil rights, and if any one had taken away property found in his possession, there would have been no remedy. He could maintain no action. But, as I have said, the possession of the slave is the possession of the master. If one having good title to personal property, should transfer it into the possession of a slave, this transfer would not be void : the title would be changed, but the title and possession must be referred to the master. Whatever chattels the slave acquires, he acquires for his master, and the master might maintain an action for them in the hands of a stranger. But an executory contract made with a slave cannot be enforced. No action could be maintained on a bond or note given to a slave. Neither master nor slave could maintain an action against the executor for the legacy given in this case, and it should seem that it might be escheated to the State in the hands of the executor.
It remains to inquire whether this can be regarded as a personal bequest to the executor, giving the property beneficially to him, and only depending on his friendship and good faith to deal with it as the testator recommends. I have no doubt but that, as observed by the Chancellor in his decree, there might be a legacy to support a favorite horse. This, however, would not be a trust for the horse, who is incapable of being a cestui que trust. It would, I apprehend, according to the terms of it, be either an absolute bequest to the legatee, depending on his good faith to carry into effect the testator’s wishes, or it would be regarded as a condition annexed to the bequest. Though such legacies must have often occurred and are spoken of as familiar — “Die, and endow a college or a cat,” — yet in the examination I have been able to make, I have found no case of such an one. It would, I suppose, be similar to the class of *oqo-i legacies spoken of by Domat, 2 vol. book 3, *Tit. 1, Sec. 8, vii. J Treating of conditions and charges annexed to a legacy, he says, “ And in fine it is said of a legacy destined for some purchase or some work, that it is left with this charge or upon this condition, that the said purchase or work be made or done by him who is charged with it.” He observes, that “it depends on the terms of the bequest, whether the charge does or does not amount to a conditionand in the same section, xxv. he adds, that in such cases “Provision ought to be made for the security of the person interested, according to the nature of the condition, whether it be by the bare submission of the person on whom the condition is imposed, or otherwise, according to the circumstances.” Perhaps in ease of such a condition, our Courts might require security for the performance of it, as in Aston v. Aston, 2 Vern. 452, where a legacy was given on a condition subsequent, the Court required security to refund, in case of the condition broken. I suppose, if a testator should give a slave bona fide and beneficially, to his legatee, he might give something more to add to his comforts or to maintain him, if he were past labor. Let us see if this was a legacy of this character. It is to be observed that there is no direct bequest to the executor at all. The will first, after legacies, gives the whole of the estate directly to the two children, who are slaves. Then follows the direction that the real estate shall be sold, and the proceeds invested in stock, the interest to be applied to the sup *305 port of the children, at the discretion of his executor, whom he appoints their guardian. Is this a bequest to the executor in any way ? We may infer that the stock was to be purchased in the name of the guardian, by conjecturing that the testator supposed that the slaves could not hold in their own names. But this is not the effect of the terms of the will. He first gives them the whole estate directly, and then directs the proceeds of the real estate to be invested. The natural construction is, that it is to be invested in the legatees’ names; that it is applied at the discretion of the executor — that he is appointed guardian,’ can make no difference. If the legatees were free white children, there would be no doubt at all that it would be a direct bequest to them. The testator knew that guardians were appointed for free negroes, and probably supposed that our laws regarded such persons as being in a state of perpetual minority. We cannot conjecture that the testator supposed them to be incapable of ^taking directly. Only the proceeds of the real estate are directed to be invested. There is no disposition of anything else but the L £’yy direct bequest to them. The personal estate is said to be very trifling; but if there be anything at all, or if the testator supposed there was anything, it rebuts the conjecture that he supposed them to be incapable of taking directly. Then follows the direction to purchase the son, John. Here, I suppose that the purchase was intended to be made, and the title taken, in the name of the executor. But it is plain that he was to purchase as executor, and that no personal benefit to him was intended. Purchased with the funds of the estate, he would become part of the estate, But the whole estate is given to the children. The meaning of this is, that John should be held by the executor as a slave, and be under his control; but that if he labored, he should enjoy the proceeds of his own labor. He is to be held by the executor in trust for himself; he is to have the use of himself. It is an attempt in effect to evade the law of the State forbidding emancipation, a law, I am persuaded, however harsh it may appear to those who have no opportunity of forming a judgment on the subject, is founded on principles of true humanity as well as just policy. With respect to the rest of the estate, as I have observed, there is no trust at all. With respect to John, there is a trust for his own benefit. In Morrice v. the Bishop of Durham, 9 Ves. 399, 10 Ves. 522, where a legacy was given to the defendant, in trust to be disposed of “to such objects of benevolence and liberality,” as he (the Bishop of Durham) should most approve of, it was held that the Bishop could not take for his own use, and that as the trust was too indefinite to be executed by .the Court, a trust resulted for the next of kin. The rule is laid down by Lord Eldon, 10 Ves. 536. “I understand a doubt has been raised in the discussion of some question, bearing analogy to this, in another Court; how far it is competent to a testator to give to his friend his personal estate, to apply it to such purposes of bounty, not arising to trust, as the testator himself would have been likely to apply it to. That question, as far as this Court has to do with it, depends altogether upon this : if the testator meant to create a trust, and not to make an absolute gift, but if the trust is ineffectually created, is not expressed at all, or fails, the next of kin take. On the other hand, if the party is to take himself, it must be on this ground, according to the authorities; *that the r*,™ testator did not in earnest create a trust, but intended a gift to L y *306 that person for his own use and benefit; for if he was intended to have it entirely in his own power and discretion, whether to make the application or not, it is absolutely given.” And again, p. 531, “If he gives upon trusts hereafter to be declared, it might perhaps have been as well to have held, that if he did not declare any trust, the. person to whom the property was given should take it. If he says he gives in trust, and stops there, meaning to make a codicil or an addition to his will, or where he gives upon trusts which fail, or are ineffectually expressed, in all those cases, the Court has said, if upon the face of the will there is declaration plain, that the person to whom the property is given, is to take it in trust; and though the trust is not declared or is ineffectually declared, or become incapable of taking effect, the party taking shall be a trustee ; if not for those who were to take under the will, for those who take under the disposition of the law.” In Gribbs v. Rumsey, 2 Ves & B. 294, after giving part of her estate to trustees, upon certain specific trusts, the testatrix gives the residue to the same trustees, (by name,) “to be disposed of unto such person or persons, and in such sum or sums of money as they in their discretion may think proper and expedient.” In that case, from the uncontrolled power of disposition given to the trustees, it was inferred that the intention was to give to the trustees beneficially for themselves. But in all the cases on the subject, the question is of the intention to give to the trustee for himself. But, in the case before us, there can be no doubt of the intention, that no benefit was intended to the executor. There is declaration plain on the face of the will, that the slaves were the only objects intended to be benefitted.
From the views I have taken, however, the plaintiffs are not entitled. The bequest to the slaves is not void, on the principles before examined. A chose in action given to alien enemy is not void, though while alien enemy he can maintain no action upon it. A trust created in favor of an alien enemy, is not incapable of being executed. “If an alien enemy 1 purchase a copyhold or land in *the name of another, in trust for -* himself and his heirs, the king shall have it.” “But if an alien purchase in the name of a trustee, the king cannot be entitled by inquisition, for the estate at law is in the trustee, not in the alien. But he must sue in Chancery to have the trust executed.” Com. Dig. Tit. Alien. C. 3. I do not say what the effect would be if the executor should think proper, of his own accord, to pay over the legacy to the slaves, or their master. But remaining in his hands, it is subject to the claim of the State.
The Chancellor’s decree must be therefore affirmed, and the bill dismissed, but without costs.
Johnson and O’Neakd, Js., concurred.